ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2012 MAR 12  PM 3: 39

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| FRANKIE SIMS and PATSY SIMS, on behalf of themselves and all others similarly situated, §§§ *Plaintiffs,* § v. §§ CARRINGTON MORTGAGE §§ SERVICES, LLC, § *Defendant.* § | CASE NO. 4:12-CV-00087-A |

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT AND BRIEF IN SUPPORT**

Thomas G. Yoxall
  Texas Bar No. 00785304
  tyoxall@lockelord.com
Robert T. Mowrey
  Texas Bar No. 14607500
  rmowrey@lockelord.com
Daron L. Janis
  Texas Bar No. 24060015
  djanis@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
(214) 740-8000
(214) 740-8800 – Facsimile

B. David L. Foster
  Texas Bar No. 24031555
  dfoster@lockelord.com
Amanda M. Schaeffer
  Texas Bar No. 24059115
  aschaeffer@lockelord.com
LOCKE LORD LLP
100 Congress Avenue, Suite 300
Austin, TX  78701-4042
(512) 305-4700
(512) 305-4800 – Facsimile

COUNSEL FOR DEFENDANT CARRINGTON
MORTGAGE SERVICES, LLC

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 1

II. FACTS ALLEGED IN THE AMENDED COMPLAINT ................................... 2

    A. PLAINTIFFS' ORIGINAL LOAN .................................................................... 2

    B. PLAINTIFFS' FIRST DEFAULT AND MODIFICATION ..................................... 3

    C. PLAINTIFFS' SECOND DEFAULT AND THE EXPEDITED FORECLOSURE PROCEEDING . 4

    D. PLAINTIFFS' SECOND MODIFICATION ........................................................ 4

III. ARGUMENT AND AUTHORITIES ................................................................. 5

    A. MODIFICATIONS OF HOME EQUITY LOANS GUARD THE UNDERLYING PURPOSE OF THE HOMESTEAD PROTECTIONS IN THE TEXAS CONSTITUTION ................................ 5

    B. PLAINTIFFS' ARGUMENTS IN THIS CASE UNDERMINE THE UNDERLYING PURPOSE OF THE HOMESTEAD PROTECTIONS IN THE TEXAS CONSTITUTION ................................ 6

    C. PLAINTIFFS' SECTION 50(F) AND SECTION 50(G) CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THEIR LOAN MODIFICATIONS WERE NOT "REFINANCES" ................................................................................................ 8

    D. SECTION 50(G) IS INAPPLICABLE TO MODIFICATIONS OF HOME EQUITY LOANS.... 14

    E. PLAINTIFFS' MODIFICATIONS COMPLY WITH SECTION 50(A)(6)(B) ....................... 15

    F. PLAINTIFFS' MODIFICATIONS DID NOT CONVERT THEIR LOAN INTO A FORM OF OPEN-END ACCOUNT AS CONTEMPLATED BY SECTION 50(A)(6)(F) ...................... 20

    G. LENDERS MAY CAPITALIZE PAST-DUE AMOUNTS RATHER THAN WAIVE THEM OR REQUIRE THE BORROWER TO BECOME CURRENT PRIOR TO MODIFICATION .......... 22

IV. CONCLUSION AND PRAYER ..................................................................... 24

i

## TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Benchmark Bank v. Crowder,*
    919 S.W.2d 657 (Tex. 1996)...................................................................................6

*Chevron Corp. v. Redmon,*
    745 S.W.2d 314 (Tex. 1987).................................................................................13

*Cinel v. Connick,*
    15 F.3d 1338 (5th Cir. 1994) ..................................................................................2

*City of Sherman v. Wayne,*
    266 S.W.3d 34 (Tex. App.—Dallas 2008, no pet.)...................................................4

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ..................................................................................2

*HBA East, Ltd. v. JEA Boxing Co., Inc.,*
    796 S.W.2d 534.....................................................................................................12

*Houston Lighting & Power Co. v. Fisher,*
    559 S.W.2d 682 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.).....................4

*LaSalle Bank Nat'l Ass'n v. White,*
    246 S.W.3d 616 (Tex. 2007)...................................................................................6

*Machicek v. Barcak,*
    141 Tex. 165, 170 S.W.2d 715 (1943).....................................................................5

*Meador v. EMC Mortgage Corp.,*
    236 S.W.3d 451 (Tex. App.—Amarillo 2007, pet. denied)...............................11, 12

*Pelt v. U.S. Bank Trust Nat'l Ass'n,*
    359 F.3d 764 (5th Cir. 2004) ..................................................................................8

*R&L Inv. Prop., LLC v. Hamm,*
    No. 3:10-CV-00864-M, 2011 WL 2462102 (N.D. Tex. June 21, 2011) ...................2

*Scanlan v. Tex. A&M Univ.,*
    343 F.3d 533 (5th Cir. 2003) ..................................................................................2

*Stringer v. Cendant Mortgage Corp.,*
    23 S.W.3d 353 (Tex. 2000)...................................................................................17

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
    987 F.2d 429 (7th Cir. 1993) ..................................................................................2

ii

## STATUTES

TEX. FIN. CODE § 11.308 ........................................................................................8, 23

TEX. FIN. CODE § 15.413 ........................................................................................8, 23

TEX. FIN. CODE § 301.002(a)(14) ................................................................................21

## OTHER AUTHORITIES

7 TEX. ADMIN. CODE § 153.1(3) ..................................................................................14

7 TEX. ADMIN. CODE § 153.1(6) ..................................................................................14

7 TEX. ADMIN. CODE § 153.3(1) ..................................................................................18

7 TEX. ADMIN. CODE § 153.3(2) ..................................................................................17

7 TEX. ADMIN. CODE § 153.3(3) ..............................................................................18, 19

7 TEX. ADMIN. CODE § 153.14(1) ................................................................................13

7 TEX. ADMIN. CODE § 153.14(2) ..............................................................9, 10, 12, 13, 15

7 TEX. ADMIN. CODE § 153.14(2)(B) ............................................................................11

7 TEX. ADMIN. CODE § 153.96 ......................................................................................9

7 TEX. ADMIN. CODE § 153.96(b) ................................................................................13

29 Tex. Reg. 10257, 10259 (2004),
   *available at* http://texinfo.library.unt.edu/texasregister/pdf/2004/1105is.pdf ..........................9

BLACK'S LAW DICTIONARY 1492 (7th ed. 1999) ...........................................................21

Fed. R. Civ. P. 10(c) .................................................................................................2

Fed. R. Civ. P. 12(b)(6) .............................................................................................1

HOME EQUITY MODIFICATION ADVISORY BULLETIN (Apr. 2009),
   http://www.fc.state.tx.us/homeinfo/modibulletin.pdf.................................................8, 14, 22, 23

FRB: A Consumer's Guide to Mortgage Settlement Costs,
   http://www.federalreserve.gov/pubs/settlement/ .....................................................19

REGULATORY COMMENTARY ON EQUITY LENDING PROCEDURES (Oct. 7, 1998),
   http://www.occc.state.tx.us/Pubdocs/HomeEquity/Cmnt_109.pdf ...................................21, 22

TEX. CONST. art. XVI, § 50(a) .....................................................................................5

TEX. CONST. art. XVI, § 50(a)(6)(B) ..................................................................................7, 15, 16

TEX. CONST. art. XVI, § 50(a)(6)(F) ......................................................................................7, 20

TEX. CONST. art. XVI, § 50(a)(6)(L) ............................................................................................4

TEX. CONST. art. XVI, § 50(a)(6)(M)(i) .....................................................................................15

TEX. CONST. art. XVI, § 50(a)(6)(M)(ii) ....................................................................................15

TEX. CONST. art. XVI, § 50(a)(6)(M)(iii) ...............................................................................9, 12

TEX. CONST. art. XVI, § 50(a)(6)(Q)(v) .....................................................................................15

TEX. CONST. art. XVI, § 50(a)(6)(Q)(ix) ....................................................................................16

TEX. CONST. art. XVI, § 50(f) ...............................................................................................7, 9

TEX. CONST. art. XVI, § 50(g) .........................................................................................7, 9, 14

TEX. CONST. art. XVI, § 50(g)(B) ...............................................................................................17

TEX. CONST. art. XVI, § 50(u) .....................................................................................................8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| FRANKIE SIMS and PATSY SIMS, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § | |
| v. | § § | CASE NO. 4:12-CV-00087-A |
| CARRINGTON MORTGAGE SERVICES, LLC, | § § § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT AND BRIEF IN SUPPORT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Carrington Mortgage Services, LLC ("Carrington") files this Motion to Dismiss Plaintiffs' First Amended Class Action Complaint [Doc. No. 8] ("Amended Complaint"), and states as follows:

## I.    INTRODUCTION

The Texas Constitution has long protected individuals' homestead rights.  The Texas Supreme Court has looked favorably upon efforts by borrowers and lenders to modify, renew, and readjust loans to enable borrowers to avoid default and stay in their homes.  In the present case, plaintiffs are seeking an interpretation of the Texas Constitution that would place a significant barrier for many homeowners to obtain modifications needed to avoid imminent default or foreclosure on their Texas home equity loans.  Plaintiffs pursue their interpretation of the Texas Constitution as part of their judicial campaign to obtain free homes for borrowers who defaulted on their loans.  Plaintiffs literally are taking the position that, because Carrington twice modified their loan—each time curing their default and lowering their monthly principal and interest payments, while still maintaining the same maturity date—Carrington's lien is no longer valid, Plaintiffs are now entitled to be excused from paying the remaining principal and interest

due on their loans, and Plaintiffs are further entitled to a refund of the principal and interest they have already paid.  This is the ultimate "gotcha" argument—borrowers pursuing a modification of their loan only to later take the position that by granting the modification requested, the lender has forfeited all rights to being repaid under the very loan that was modified.  Fortunately, the Texas Constitution does not impose such a trap on lenders willing to modify loans to help borrowers avoid the loss of their homesteads by foreclosure.  Plaintiffs fail to state a claim upon which relief may be granted and their claims should be dismissed with prejudice.

## II.     FACTS ALLEGED IN THE AMENDED COMPLAINT[1]

### A.     PLAINTIFFS' ORIGINAL LOAN

Plaintiffs obtained a home equity loan in the amount of $76,000.00, on August 8, 2003,

---

[1] The facts recited in this section are facts that are either (1) alleged in the Amended Complaint, (2) contained in exhibits attached to *Plaintiffs' Original Class Action Complaint* [Doc. No. 1] ("Original Complaint"), or (3) contained in the Texas Home Equity Note ("Note") and Texas Home Equity Security Instrument ("Security Instrument") that are at issue in this case.  Generally, in considering a motion to dismiss under Rule 12(b)(6), a court "must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  However, the Fifth Circuit has recognized an exception to this rule. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Under that exception, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins*, 224 F.3d at 498-99 (quoting with approval *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

Although Plaintiffs did not attach to the Amended Complaint the exhibits attached to the Original Complaint, they are cited in the Amended Complaint and those that are attached hereto are central to Plaintiffs' claims. *See id.* Moreover, as one judge in the Northern District of Texas recently pointed out, it would be "completely wasteful and unfair for Plaintiff's amendment to be treated as eradicating the documents on which Plaintiff's claims are based merely because Plaintiff has recently chosen not to attach the documents upon which it has already based and pled its claims." *R&L Inv. Prop., LLC v. Hamm*, No. 3:10-CV-00864-M, 2011 WL 2462102, at *2 (N.D. Tex. June 21, 2011) (further holding that, "[h]aving so used the documents, Plaintiff cannot eliminate Defendants' ability to rely on those same documents").

Similarly, while Plaintiffs do not specifically refer to the Note and Security Instrument by name in the Amended Complaint, they allege that they "got a home equity loan for $76,000.00 in August, 2003." Amended Complaint ¶36.  Moreover, the two Loan Modification Agreements that Plaintiffs attached to the Original Complaint, and which are therefore "part of the pleading for all purposes," *see* Fed. R. Civ. P. 10(c), specifically refer to the Note and Security Instrument as the instruments being modified. *See* Loan Modification Agreement at APPENDIX 23, § 1(A)-(B) (attached to Original Complaint as Exhibit A and attached hereto as Exhibit 3); Loan Modification Agreement at APPENDIX 25, § 1 (attached to Original Complaint as Exhibit C and attached hereto as Exhibit 4).  Thus, the Note and Security Instrument are "referred to in [Plaintiffs'] complaint and are central to [their] claim." *Collins*, 224 F.3d at 498-99.  Furthermore, the Security Instrument is recorded in the real property records of Tarrant County, Texas and is therefore a public record of which the Court may take judicial notice. *See Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.").  Accordingly, the Court may consider all of the exhibits attached hereto without converting this motion into a motion for summary judgment.

---

by executing a Texas Home Equity Note ("Note") and a Texas Home Equity Security Instrument ("Security Instrument"), which secured payment of the Note by placing a lien on Plaintiffs' homestead property located at 3419 N.W. 26th Street, Fort Worth, Texas 76106 ("Property"). *See* Amended Complaint ¶36. *See also generally* Note at APPENDIX 1-4 (attached hereto as Exhibit 1); Security Instrument at APPENDIX 5-22 (attached hereto as Exhibit 2). According to the terms of the Note, Plaintiffs' original interest rate was 9.000 percent, their monthly principal and interest payments were $611.51, and the maturity date of the loan was September 1, 2033. *See* Note (Ex. 1) at APPENDIX 1, §§ 3(A)-(B). Plaintiffs do not dispute that the original loan fully complied with article XVI, section 50 of the Texas Constitution.

## B.   PLAINTIFFS' FIRST DEFAULT AND MODIFICATION

Plaintiffs defaulted on their loan payments by mid-2009. In order to resolve their default and avoid foreclosure, Plaintiffs entered into a Loan Modification Agreement with Carrington on September 25, 2009 (the "First Modification"). *See* Amended Complaint ¶37; Loan Modification Agreement (Ex. 3) at APPENDIX 23-24. The First Modification capitalized approximately $2,200.00 of past-due interest, resulting in a principal balance of $74,345.50— still $1,654.50 less than the original principal amount of the loan. *See* Amended Complaint ¶37; Loan Modification Agreement (Ex. 3) at APPENDIX 23, § II(A). The First Modification also reduced the interest rate to 6.500 percent, resulting in a new monthly principal and interest payment in the amount of $511.16. Loan Modification Agreement (Ex. 3) at APPENDIX 23-24, §§ II(B), (E). The maturity date did not change. *Id.* at § II(D). According to Plaintiffs, the Tarrant County Appraisal District's assessed value of the Property in 2009 was $72,300.00.[2] Amended Complaint ¶37.

---

[2] As explained more fully below, the value of the Property in 2009, or at any time after August 8, 2003 for that matter, is irrelevant under the Texas Constitution. The only meaningful and relevant value is the value of the

## C.   PLAINTIFFS' SECOND DEFAULT AND THE EXPEDITED FORECLOSURE PROCEEDING

Although the First Modification reduced Plaintiffs' monthly principal and interest payments by just over $100.00 (approximately 16.5 percent), Plaintiffs defaulted on their loan payments again in 2011. Amended Complaint ¶38. As a result, Carrington filed an expedited foreclosure proceeding. *Id.* On November 3, 2011, Plaintiffs filed a motion for continuance in the foreclosure proceeding arguing that the First Modification violated Texas Constitution article XVI, section 50(a)(6)(L) because it capitalized past-due interest. *See* Respondents' Motion for Continuance at APPENDIX 33, ¶¶6-7 (attached to Original Complaint as Exhibit B and attached hereto as Exhibit 5). Plaintiffs specifically argued that the capitalization of past-due interest did not comply with the requirement that a home equity loan be repaid in "installments that 'equal or exceed the amount of accrued interest as of the date of the scheduled installment.'" *Id.* at ¶7 (quoting TEX. CONST. art. XVI, § 50(a)(6)(L)). The motion for continuance did not assert or make any allegations of a violation of sections 50(a)(6)(B), 50(a)(6)(F), 50(f), or 50(g), *see generally id.*, and the Amended Complaint does not assert or make any allegations of a violation of section 50(a)(6)(L). *See generally* Amended Complaint.

## D.   PLAINTIFFS' SECOND MODIFICATION

Before the foreclosure action proceeded to a hearing, Plaintiffs resolved their default by entering into a second Loan Modification Agreement with Carrington on December 9, 2011 (the "Second Modification"). *See* Amended Complaint ¶40; Loan Modification Agreement (Ex. 4) at

---

Property on August 8, 2003—i.e., the date on which the original loan was closed. Because the original principal amount of Plaintiffs' loan was $76,000.00, and because Plaintiffs do not dispute that the original principal amount was no more than 80 percent of the fair market value on the date of closing, the value of the Property must have been at least $95,000.00. In any event, Texas courts have held that the tax appraisal is not probative evidence of true market value. *See City of Sherman v. Wayne*, 266 S.W.3d 34, 49 (Tex. App.—Dallas 2008, no pet.) ("[T]he tax appraisal is no criterion of market value in condemnation proceedings because it rarely reflects the true market value."); *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 686-87 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.) ("[I]t is generally held that the value placed upon real property for the purposes of taxation by assessment without participation of the landowner is not evidence of its value for purposes other than taxation.").

---

APPENDIX 25-31.  The Second Modification capitalized $7,368.44 of past-due interest, escrow advances, fees, and/or other costs, but also wrote off $357.70 of other amounts due, resulting in a principal balance of $80,023.95.  *See* Amended Complaint ¶40; Loan Modification Agreement (Ex. 4) at APPENDIX 27, §§ III(1)(A), (C), (D), and (F).  The Second Modification also further reduced the interest rate to 4.750 percent, resulting in a new monthly principal and interest payment in the amount of $492.34.  Loan Modification Agreement (Ex. 4) at APPENDIX 27, § III(1)(F).  As with the First Modification, the maturity date did not change.  *Id.*  According to Plaintiffs, the Tarrant County Appraisal District's assessed value of the Property in 2011 was $73,000.00 and Carrington's estimate of the Property's value at the time was $76,100.00.[3] Amended Complaint ¶37.  As of the date that this lawsuit was filed, Plaintiffs had made, and Carrington had accepted, their payments under the Second Modification.  *See id.* at ¶40.

## III.   ARGUMENT AND AUTHORITIES

### A.   MODIFICATIONS OF HOME EQUITY LOANS GUARD THE UNDERLYING PURPOSE OF THE HOMESTEAD PROTECTIONS IN THE TEXAS CONSTITUTION

The Texas Constitution protects a homestead from forced sale for the payment of all debts except those specifically identified and defined within article XVI, section 50.  *See* TEX. CONST. art. XVI, § 50(a) ("The homestead ... shall be, and is hereby protected from forced sale, for the payment of all debts except for ....").  Consistent with the objective of protecting a homestead from forced sale, the Texas Supreme Court has emphasized the importance of protecting a homeowner's ability to "renew, rearrange, and readjust" encumbering obligations on a homestead in order to prevent a loss of the homestead through foreclosure.  *Machicek v. Barcak*, 141 Tex. 165, 170 S.W.2d 715, 717 (1943).  The Court has further warned that if such

---

[3] *See supra* n.2.

protection is not carefully guarded, "the very purpose of the constitutional inhibition against encumbering the homestead [would] be defeated." *Id.*

In 1996, the Texas Supreme Court reiterated that "[h]omestead owners must have the ability to renew, rearrange, and readjust the encumbering obligation to prevent a loss of the homestead through foreclosure." *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661 (Tex. 1996). Most recently, in 2007, the Texas Supreme Court applied this "longstanding common law principle" to home equity loans under section 50(a)(6) of the Texas Constitution when it again emphasized that homeowners need to be provided with "the flexibility to rearrange debt and avoid foreclosure." *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 620 (Tex. 2007). In *White*, the Court stressed that, if lenders are hesitant to help a home equity borrower due to increased risk that they might be forced to forfeit their liens, homeowners would lose the flexibility needed to rearrange their debt and avoid foreclosure. *Id.*

**B. PLAINTIFFS' ARGUMENTS IN THIS CASE UNDERMINE THE UNDERLYING PURPOSE OF THE HOMESTEAD PROTECTIONS IN THE TEXAS CONSTITUTION**

In direct opposition to the underlying purpose of the Texas Constitution's homestead protections, Plaintiffs argue that the two loan modifications they received from Carrington, both of which rearranged their debt and enabled them to avoid foreclosure on their homestead, did not comply with the following provisions, each of which relates to an "extension of credit" as defined in section 50(a)(6)—i.e. a home equity loan:

- § 50(a)(6)(B) (provides that an extension of credit must be "of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made").

- § 50(a)(6)(F) (provides that an extension of credit may not be "a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit").

- § 50(f) (provides that "[a] refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of this section, may not be secured by a valid lien against the homestead unless the refinance of the debt is an extension of credit described by Subsection (a)(6) or (a)(7) of this section").

- § 50(g) (provides that "[a]n extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument ...").

See Amended Complaint ¶¶10, 12; see also TEX. CONST. art. XVI, §§ 50(a)(6)(B), 50(a)(6)(F), 50(f), and 50(g).[4] The basis for Plaintiffs' argument with respect to each of the above provisions is that the modifications "added or advanced past-due interest into a new home equity loan principal under the relevant note without fulfilling all the prerequisites of Art. XVI Sec. 50 ...." Amended Complaint ¶42(a). Plaintiffs also specifically argue that the modifications of Plaintiffs' loan failed to comply with section 50(a)(6)(B) because they allegedly resulted in a loan-to-value ratio that exceeded 80 percent. Id. at ¶42(b).

Implicit in all of Plaintiffs' arguments is the illogical contention that a modification that capitalizes past-due interest is not actually a modification at all, but is instead a refinance under section 50(f). See Amended Complaint ¶42(c). Plaintiffs' underlying assumption is wholly unsupported by the Texas Constitution and is simply wrong. Plaintiffs' loan was not refinanced, Carrington did not advance any additional funds, and the loan modifications did not run afoul of any of the Texas Constitution's home equity loan requirements.

Furthermore, an adoption of Plaintiffs' arguments in this case would seriously chill lenders' willingness and ability to offer modifications to distressed homeowners who are in danger of losing their homestead because they can no longer keep up with their payments, and

---

[4] Rather than paraphrase the provisions of the Constitution as Plaintiffs did in the Amended Complaint, Carrington has quoted the actual language.

would thereby undermine and frustrate the very purpose of the homestead protections that Plaintiffs seek to enforce.  Nevertheless, Plaintiffs are asking the Court to invalidate "hundreds or thousands" of home equity loans that were modified in an effort to help homeowners avoid foreclosure on their homesteads by rearranging their debt.  Amended Complaint ¶56(a).  If Plaintiffs were to prevail on their claims, then lenders would be hard pressed to help any homeowner avoid foreclosure by modifying a defaulted home equity loan, since doing so would put the lender at risk of forfeiting all principal and interest on the loan.  By putting to rest the meritless claims in this lawsuit based on the sound application of legal precedent and the reasoned interpretation of the plain language of the constitutional provisions at issue, this Court would encourage lenders in Texas to modify existing home equity loans that are in default and at risk of foreclosure, thereby furthering the protection of Texas homestead property.

**C.    PLAINTIFFS' SECTION 50(F) AND SECTION 50(G) CLAIMS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THEIR LOAN MODIFICATIONS WERE NOT "REFINANCES"**

According to the Joint Financial Regulatory Agencies (the "Commissions"),[5] there is a clear distinction under section 50 of the Texas Constitution between a "modification" and a

---

[5] The Texas Constitution was amended, on September 13, 2003, to allow the Legislature to delegate by statute to "one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section [50]." TEX. CONST. art. XVI, § 50(u).  Later that year, the Texas Legislature delegated such authority to the Texas Department of Banking, Texas Department of Savings and Mortgage Lending (previously the Texas Savings & Loan Department), Office of Consumer Credit Commissioner, and Texas Credit Union Department (collectively the "Commissions" or "Joint Financial Regulatory Agencies").  *See* TEX. FIN. CODE §§ 11.308, 15.413.  Pursuant to that authority, the Commissions promulgated interpretive rules in January 2004, which are codified in chapter 153 of the Texas Administrative Code.  To a large degree, these rules adopted earlier interpretations suggested by the Commissions in their Regulatory Commentary on Equity Lending Procedures (the "Commentary").  *See Pelt v. U.S. Bank Trust Nat'l Ass'n*, 359 F.3d 764, 769 n.4 (5th Cir. 2004) (recognizing the Commentary's "persuasive value").  Promulgation of the more authoritative rules in the Texas Administrative Code was accompanied by commentary from the Commissions, which has been published in the Texas Register.  The Commissions also published a Home Equity Modification Advisory Bulletin ("Advisory Bulletin") in April 2009 addressing certain issues relating to home equity loan modifications.  Unlike the Texas Administrative Code rules, however, the Advisory Bulletin was not published pursuant to the Commissions' constitutional and statutory authority to interpret the home equity provisions of the Constitution.  *See* HOME EQUITY MODIFICATION ADVISORY BULLETIN (Apr. 2009) at APPENDIX 46, http://www.fc.state.tx.us/homeinfo/modibulletin.pdf (attached hereto as Exhibit 6) (declaring that "[t]his statement is not an interpretation of the Texas Constitution and is not being issued under Texas Finance Code, §11.308 and §15.413").  This background is important to understanding the relative weight that should be given to the Commissions' various publications.

---

"refinance" of a home equity loan. "A modification of a home equity loan occurs when one or more terms of an existing equity loan is modified, *but the note is not satisfied and replaced*." 7 TEX. ADMIN. CODE § 153.14(2) (emphasis added). In contrast, "[a] refinance creates a new loan whereas a modification amends the original loan." 29 Tex. Reg. 10257, 10259 (2004), *available at* http://texinfo.library.unt.edu/texasregister/pdf/2004/1105is.pdf. While both modifications and refinances are permissible, *see* 7 TEX. ADMIN. CODE § 153.96 (allowing either a modification or refinance to cure a home equity loan under section 50(a)(6)(Q)(x)(f)), the consequences differ.

Under the express terms of the Texas Constitution, a refinance of a home equity loan must satisfy the requirements of sections 50(a)(6) anew. *See* TEX. CONST. art. XVI, § 50(f) (providing that a refinance of a section 50(a)(6) extension of credit must itself comply with section 50(a)(6) to be secured by a valid lien). Because such a refinance must comply anew with section 50(a)(6), it may not occur within one year of the closing date of the prior home equity loan and it must be preceded at least twelve days by a written notice in compliance with section 50(g). *See id.* at §§ 50(a)(6)(M)(iii), 50(g).

In contrast, a modification is not a new extension of credit, but is "considered a single transaction" with the original home equity loan. 7 TEX. ADMIN. CODE § 153.14(2). Thus, a modification need not renew compliance with the provisions of sections 50(a)(6) that apply only at the loan's origination, nor is it necessary to renew compliance with the notice requirement in section 50(g). Moreover, a modification may occur within one year of the closing date of the prior home equity loan. *Id.* ("Section 50(a)(6)(M)(iii) does not prohibit modification of an equity loan before one year has elapsed since the loan's closing date.").

The modifications in this case were, in fact, modifications rather than refinances. As explained above, the defining characteristic of a modification is that "*the note is not satisfied and*

---

*replaced.*" 7 TEX. ADMIN. CODE § 153.14(2) (emphasis added). It is clear that the Loan Modification Agreements in this case did not satisfy and replace the Note. To the contrary, the First Modification states that it "modifies the terms of your *existing* mortgage loan" and the Second Modification states that it "will ... *amend and supplement* (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage." Loan Modification Agreement (Ex. 3) at APPENDIX 23 (emphasis added); Loan Modification Agreement (Ex. 4) at APPENDIX 26, § II (emphasis added). Even more to the point, the First Modification provides:

> *All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect,* except as modified herein, and *none of your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof,* nor will this Agreement in any way impair, diminish, or affect and [sic] of CMS's rights under or remedies on your Note and Mortgage, whether such rights or remedies arise thereunder or by operation of law.

Loan Modification Agreement (Ex. 3) at APPENDIX 24, § II(G)(2) (emphasis added).

Similarly, the Second Modification provides:

> That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; *nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents*; and that except as otherwise specifically provided in, and expressly modified by, this Agreement, the Lender and you will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

Loan Modification Agreement (Ex. 4) at APPENDIX 28, § IV(1)(G) (emphasis added).

Because the modification agreements, by their express terms, did not satisfy or replace the Note, Plaintiffs' modifications were just that—modifications. Accordingly, as a matter of law, they were not subject to any requirement of renewed compliance with section 50(a)(6) or section 50(g). *See* 7 TEX. ADMIN. CODE § 153.14(2) ("The home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction.").

Furthermore, Plaintiffs' sole basis for arguing that the modifications were refinances is directly contradicted by the law in Texas. According to Plaintiffs, "Defendant's 'modification' is in reality a non-conforming 'refinance' because it added or advanced past-due interest owed by the borrower into new principal." Amended Complaint ¶22. Stripped to its essence, Plaintiffs' argument is that the capitalization of past-due interest constitutes "an 'advancement of additional funds' to the borrower[,]" *id.* at ¶24, which "is not permitted by modification of an equity loan." 7 TEX. ADMIN. CODE § 153.14(2)(B). However, even if "the advance of additional funds" could transform a modification into a refinance (as Plaintiffs appear to assume it can), it is clear under Texas law that no additional funds were advanced in either of the modifications.

In *Meador v. EMC Mortgage Corp.*, 236 S.W.3d 451, 452 (Tex. App.—Amarillo 2007, pet. denied), the court was asked to determine what was meant by the phrase "the advance of additional funds" found in article XVI, section 50(e) of the Texas Constitution. In answer to that question, the court construed the term "additional funds" as "monies obtained *in excess of the pre-existing debt.*" *Id.* at 453. Thus, for a modification to include an "advance of additional funds," monies must be advanced in excess of the pre-existing debt at the time of modification.

Under the Security Instrument, the pre-existing debt at the time of modification included all unpaid principal, past-due interest, late charges, and advances for taxes and insurance. *See* Security Instrument (Ex. 2) at APPENDIX 7 ("This Security Instrument secures to Lender … the repayment of the Extension of Credit, and all extensions and modifications of the Note").[6]

---

[6] *See also* Security Instrument (Ex. 2) at APPENDIX 6, §§ E, G (defining "Extension of Credit" as "the debt evidenced by the Note" and providing that "[t]he Note states that Borrower owes Lender [$76,000.00] plus interest"); APPENDIX 7, §1 ("Borrower shall pay when due the principal of, and interest on, the debt evidence by the Note and any late charges under the Note. The Borrower shall also pay funds for Escrow Items pursuant to Section 3."); APPENDIX 10, § 5 ("Any amounts disbursed by Lender under this Section 5 [i.e., advances for insurance] shall become additional debt of Borrower secured by this Security Instrument."); and APPENDIX 12, § 9 ("Any amounts disbursed by Lender under this Section 9 [i.e., advances for taxes] shall become additional debt of Borrower secured by this Security Instrument.").

Plaintiffs do not disagree. *See* Amended Complaint ¶24 (admitting that, "[w]here a borrower has incurred past-due interest under a Texas home equity loan, that past-due interest is a debt owed to the lender"). Therefore, the past-due interest is part of the pre-existing debt at the time of a modification. Just as a refinance that capitalizes a portion of the pre-existing debt does not constitute or include "the advance of additional funds," as explained in *Meador*, a modification that merely capitalizes a portion of the pre-existing debt—such as past-due interest, escrow advances, fees, or other costs—also does not include "the advance of additional funds."

Finally, the fact that a loan modification is not a "refinance" subject to section 50(f)'s requirement of renewed compliance with sections 50(a)(6) and 50(g) is illustrated by the authoritative interpretations given by the Commissions. For instance, one limitation placed on Texas home equity loans is that they may not be refinanced within one year of the loan's closing date. *See* TEX. CONST. art. XVI, § 50(a)(6)(M)(iii). In contrast, the Commissions have explained that "[s]ection 50(a)(6)(M)(iii) does not prohibit modification of an equity loan before one year has elapsed since the loan's closing date." 7 TEX. ADMIN CODE § 153.14(2). The Commissions continued by placing restrictions on home equity loan modifications including: (1) the modifications must be in writing and agree to by the borrower; (2) the modification must not include an advance of additional funds; (3) the modification may not add new terms that were not allowed under applicable law on the date the original loan was closed; and (4) any fees charged in connection with the modification, when added to the fees charged at the time of origination, must not exceed section 50(a)(6)(E)'s three-percent cap. *Id.* These provisions relating to modifications would be unnecessary and meaningless if, as Plaintiffs contend, a loan modification is the same as a refinance under section 50(f) that must comply with sections 50(a)(6) and 50(g). *See HBA East, Ltd. v. JEA Boxing Co., Inc.*, 796 S.W.2d 534, 538 (Tex.

App.—Houston [1st Dist.] 1990, writ denied) (when construing a statute or regulatory provision, courts must give effect to all provisions and not render any language surplusage); *see also Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987) (same).

This point is also shown in the Commissions' interpretation of the cure provisions under section 50(a)(6), as follows:

To correct a failure to comply under Section 50(a)(6)(Q)(x)(f):

(1)    the lender or holder has the option to either refund or credit $1,000; and

(2)    the lender or holder and borrower may:

    (A)    modify the equity loan without completing the requirements of a refinance; *or*

    (B)    refinance with an extension of credit that complies with Section 50(a)(6).

7 Tex. Admin. Code § 153.96(b) (emphasis added).   By giving lenders a choice between a modification "without completing the requirements of a refinance" *or* a refinance "that complies with Section 50(a)(6)," the Commissions again recognized that there is a clear distinction between the two options and, importantly, that a modification need not re-comply with all of the requirements of section 50(a)(6).   Similarly, when the Commissions wanted to address refinances instead of modifications, they did so expressly.   *Compare* 7 Tex. Admin. Code § 153.14(1) (addressing refinances) *with* 7 Tex. Admin. Code § 153.14(2) (addressing modifications).   By trying to collapse these two terms, Plaintiffs are trying to re-write the law.

Under the proper interpretation of Texas law, as discussed in this section, Plaintiffs' claim that the loan modifications did not comply with sections 50(f) and 50(g) of the Texas Constitution fails as a matter of law and should be dismissed with prejudice.

D.    **SECTION 50(G) IS INAPPLICABLE TO MODIFICATIONS OF HOME EQUITY LOANS**

Plaintiffs' section 50(g) claim fails as a matter of law because the plain language of section 50(g) and the interpretive rules promulgated by the Commissions demonstrate that the written notice is only required in connection with the closing of the original loan.  Section 50(g) provides that "[a]n extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if *the extension of credit* is not *closed* before the 12th day after the lender provides the owner with the following written notice on a separate instrument: ...."  TEX. CONST. art. XVI, § 50(g) (emphasis added).  This provision goes on to provide a form notice containing disclosures advising the borrower that the contemplated loan is an extension of credit defined by section 50(a)(6) of the Texas Constitution and essentially restating the subsections of section 50(a)(6).  *Id.*

As shown by the emphasized language above, the timing of the disclosures specifically relates to the date on which the extension of credit is closed.  The terms "closed" or "closing" are alternately defined as "the date when each owner and the spouse of each owner signs the equity loan agreement" and/or "the act of signing the equity loan agreement by each owner and the spouse of each owner."  7 TEX. ADMIN. CODE § 153.1(3).  The phrase "date the extension of credit is made" is defined as "the date on which the closing of the equity loan occurs."  *Id.* at § 153.1(6).  Significantly, the Commissions have clarified that "*[t]he date of the modification is not the date that the original extension of credit is made.*"  *See* ADVISORY BULLETIN (Ex. 6) at APPENDIX 47 (also explaining that the phrase "the date the extension of credit is made" refers to "the original closing") (emphasis added).  Because a lender is only required to provide the section 50(g) disclosures in connection with the closing of the original loan, and because "[a] home equity loan and a subsequent modification will be considered a single transaction," 7 TEX.

ADMIN. CODE § 153.14(2), a lender is not required to re-issue the same disclosures a second time when a loan is subsequently modified.

Notably, Plaintiffs do not allege that they were not provided with timely section 50(g) disclosures in connection with the closing of their home equity loan. Rather, they allege simply that they were not provided with the same written disclosures a second (or third) time in connection with their modifications. As shown above, however, the plain language of section 50(g), in conjunction with the Commissions' interpretations of what constitutes a closing, requires the written notice only in connection with the *closing of the original loan.* Simply put, once a lender has complied with section 50(g) by providing the prescribed written notice at least 12 days before the closing of the original equity loan, that compliance does not come unraveled due to a subsequent modification of the loan.[7] Accordingly, Plaintiffs' claim under section 50(g) should be dismissed with prejudice.

## E.    PLAINTIFFS' MODIFICATIONS COMPLY WITH SECTION 50(A)(6)(B)

Plaintiffs allege that their modifications did not comply with article XVI, section 50(a)(6)(B) of the Texas Constitution because the resulting principal balances of their loan exceeded 80 percent of the fair market value of the Property. *See* Amended Complaint ¶¶9(b), 10.[8]   Section 50(a)(6)(B) provides that an extension of credit under section 50(a)(6) must be

---

[7] Other provisions in section 50(a)(6) that relate specifically to the date an extension of credit is closed further support this conclusion because they make no sense in the context of a modification of an existing home equity loan. *See, e.g.,* TEX. CONST. art. XVI, § 50(a)(6)(M)(i) (requiring that the closing occur 12 or more days after the loan application is submitted to the lender); *id.* at §§ 50(a)(6)(M)(ii) (requiring that the closing occur one business day after the owner receives a copy of the loan application and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing); *id.* at § 50(a)(6)(Q)(v) (requiring that the owner receive, at the time the extension of credit is made, a copy of the final loan application and all documents signed at closing).

[8] Notably, Plaintiffs appear to base their section 50(a)(6)(B) claim on what they allege was the fair market value of the Property as of the dates of the modifications, not the date on which the extension of credit was made. *See, e.g., id.* at ¶¶37, 40 (citing the tax assessment value of the Property as of the dates of the modifications). However, section 50(a)(6)(B) explicitly refers to "the fair market value of the homestead *on the date the extension of credit is made.*" TEX. CONST. art. XVI, § 50(a)(6)(B) (emphasis added). Thus, the only value that is relevant in this case is the value as of August 8, 2003. As explained previously, that value was at least $95,000.00. *See supra* n.2.

---

of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead *on the date the extension of credit is made.*

TEX. CONST. art. XVI, § 50(a)(6)(B) (emphasis added).

According to its plain language, section 50(a)(6)(B) involves three variables: (1) the principal amount of the home equity loan, (2) the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead, and (3) the fair market value of the homestead. The first issue in construing this provision is whether the phrase "on the date the extension of credit is made" modifies each of the three variables. If it does, then the 80 percent test applies only once at the time of origination.

The phrase "on the date the extension of credit is made" clearly modifies the third variable—i.e., the fair market value of the homestead—because it immediately follows that variable. In addition, section 50(a)(6)(Q)(ix) requires the owner and lender to acknowledge in writing "the fair market value of the homestead property on the date the extension of credit is made." TEX. CONST. art. XVI, § 50(a)(6)(Q)(ix). It is further instructive that a section 50(a)(6) extension of credit "may not be accelerated because of a decrease in the market value of the homestead." *Id.* at § 50(a)(6)(J). Finally, it would be nonsensical to use the current value of the homestead as a measure for section 50(a)(6)(B)'s test because it could result in the loan falling out of compliance with that provision without the lender having done anything. Thus, the only property value that is of any significance is the value on the date of closing.

There is strong evidence, however, that the qualifying phrase "on the date the extension of credit is made" was not placed in section 50(a)(6)(B) solely to modify the third variable—i.e., the fair market value of the homestead. For example, the Commissions have explicitly applied the qualifying phrase to the second variable—i.e., the aggregate total of the outstanding principal

balances of all other indebtedness secured by valid encumbrances of record against the homestead. *See* 7 TEX. ADMIN. CODE § 153.3(2) ("The principal balance of all outstanding debt secured by the homestead *on the date the extension of credit is made* determines the maximum principal amount of an equity loan.") (emphasis added).  As with a decrease to the value of the property, it would be nonsensical to use the current amount of indebtedness on other liens because an increase in the amount of such indebtedness due to the borrower's default on that indebtedness, for example, could likewise result in the loan falling out of compliance with section 50(a)(6)(B) without the lender having done anything.

Inasmuch as the phrase "on the date the extension of credit is made" modifies both the second and third variables in section 50(a)(6)(B), it logically follows that the phrase also modifies the first variable—i.e., the principal amount of a home equity loan.  However, one need not rely on logic alone since the same conclusion is supported by another provision of the Constitution, as well as related interpretations by the Commissions.

First, one of the disclosures to the homeowner required by section 50(g) states that "the principal amount *at the time the loan is made* must not exceed an amount that, when added to the principal balance of all other liens against your home, is more than 80 percent of the fair market value of your home."  *Id.* § 50(g)(B) (emphasis added).  As explained by the Texas Supreme Court, the purpose of the 50(g) disclosures is to "notif[y] the prospective borrower of the terms and conditions that apply to the home-equity lender's extension of credit."  *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 357 (Tex. 2000).  While the substantive provisions in section 50(a)(6) prevail over the notice provisions in section 50(g) when there is a conflict between the two, *see id.*, there is no conflict between section 50(a)(6)(B) and the notice provision here.  The notice provision simply aids in the interpretation of section 50(a)(6)(B) by suggesting that the

drafters of the home equity provisions intended the qualifying phrase at the end of section 50(a)(6)(B) to apply to each of the variables listed therein, including the first variable regarding the principal amount of the loan.

Second, in interpreting section 50(a)(6)(B) pursuant to their constitutional and statutory authority, the Commissions have defined the term "principal amount" to include only "the amount of the cash advanced" and "the charges *at the inception* of an equity loan to the extent these charges are financed in the principal amount of the loan." 7 TEX. ADMIN. CODE § 153.3(1) (emphasis added). Again, the focus of the Commissions is on the original principal amount due on the date the extension of credit is made.

Third, with regard to what is included in the "principal amount" for section 50(a)(6)(B) purposes, the Commissions have further stated:

> The principal amount of an equity loan does not include interest accrued after the date the extension of credit is made (other than any interest capitalized and added to the principal balance on the date the extension of credit is made), or other amounts advanced by the lender after closing as a result of default, including for example, ad valorem taxes, hazard insurance premiums, and authorized collection costs, including reasonable attorney's fees.

*Id.* § 153.3(3) (emphasis added). This rule begins with the premise that all interest that accrues *after* the date the extension of credit is made and all other amounts advanced by the lender *after* closing are never considered part of the principal amount under section 50(a)(6)(B). The only exception to that rule (as explained in the parenthetical) is very narrow and applies only when interest that will accrue after the date of closing is capitalized and added to the principal *on the date of closing*. This exception covers a common feature of residential loans where prepaid interest that accrues after closing is capitalized or "wrapped in" to the principal amount of the

equity loan at closing.[9] Accordingly, the "principal amount" of an equity loan *does not include any other interest that accrues after the date the extension of credit is made*. That includes any accrued-but-unpaid interest that is later capitalized as part of a subsequent modification of an existing equity loan. Because subsequently capitalized interest pursuant to a modification of an existing equity loan is not considered part of the "principal amount" under section 50(a)(6)(B), it simply does not factor into the eighty-percent test under that provision.

This result is consistent with the fact that the past-due interest and other amounts that were capitalized as part of Plaintiffs' modification were already secured by the lien on their property before the modifications even occurred. *See supra* § III(C) (discussing what is secured by the Security Instrument). Merely capitalizing such amounts as part of a modification did nothing to change Plaintiffs' equity position or the amount of the lien. The equity they had in their property was exactly the same immediately after each modification as it was immediately prior to each modification. Accordingly, it would serve no legitimate purpose to re-apply the 80-percent test under section 50(a)(6)(B) at the time of modification.

---

[9] To understand how this feature works requires an understanding of what prepaid interest is and how it is handled in a typical residential loan transaction. The concept of prepaid interest has been explained by the Federal Reserve Board as follows:

> Your first regular mortgage payment is usually due about six to eight weeks after you settle (for example, if you settle in August, your first regular payment will be due on October 1; the October payment covers the cost of borrowing the money for the month of September). Interest costs, however, start as soon as you settle. The lender will calculate how much interest you owe for the part of the month in which you settle (for example, if you settle on August 16, you would owe interest for 16 days--August 16 through 31).

FRB: A Consumer's Guide to Mortgage Settlement Costs, http://www.federalreserve.gov/pubs/settlement/ (last visited March 12, 2012).

Prepaid interest can be handled in one of two ways with regard to home equity loans. First, the borrower may pay the interest out of pocket by bringing funds to the closing in the amount of the prepaid interest. Alternatively, the borrower can elect to have the prepaid interest financed or "wrapped in" to the principal of the new home equity loan. When the borrower chooses the second option, the principal amount is increased by the amount of prepaid interest thereby causing the prepaid interest—which does not actually accrue until after the extension of credit is made—to be "capitalized and added to the principal balance on the date the extension of credit is made." 7 TEX. ADMIN. CODE § 153.3(3). Thus, all the parenthetical in Rule 153.3(3) means is that prepaid interest is considered part of the principal amount for purposes of section 50(a)(6)(B) if it is financed or "wrapped in" to the loan amount rather than being paid separately by the borrower at closing.

---

In this case there is no dispute that Plaintiffs' loan complied with section 50(a)(6)(B) on the date the extension of credit was made.  Moreover, there is no dispute that the only amounts capitalized as part of the modifications were interest or other amounts that accrued after the extensions of credit were made and that were already secured by the lien on Plaintiffs' property.  Finally, it is clear that any capitalization of such amounts only occurred after the date on which the extension of credit was made.  Accordingly, any past-due interest or other amounts that may have been capitalized as part of the modifications are not included in the calculation of the "principal amount" of Plaintiffs' extensions of credit under section 50(a)(6)(B).  As a result, Plaintiffs' 50(a)(6)(B) claim fails as a matter of law and should be dismissed with prejudice.

**F.    PLAINTIFFS' MODIFICATIONS DID NOT CONVERT THEIR LOAN INTO A FORM OF OPEN-END ACCOUNT AS CONTEMPLATED BY SECTION 50(A)(6)(F)**

Plaintiffs assert that the modifications of their loans "were a form of open-end account under which credit was extended from time to time" and which is prohibited by article XVI, section 50(a)(6)(F) of the Texas Constitution.  Section 50(a)(6)(F) requires that an equity loan not be "a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit." TEX. CONST. art. XVI, § 50(a)(6)(F).  Thus, the threshold issue with regard to compliance with this provision is what constitutes an "open-end account that may be debited from time to time or under which credit may be extended from time to time."

The term "open-end account" is defined in the Texas Finance Code as "an account under a written contract between a creditor and an obligor in connection with which:

(i)  the creditor reasonably contemplates repeated transactions and the obligor is authorized to make purchases or borrow money;

(ii)  interest or time price differential may be charged from time to time on an outstanding unpaid balance; and

---

(iii) the amount of credit that may be extended during the term of the account is generally made available to the extent that any outstanding balance is repaid ...."

TEX. FIN. CODE § 301.002(a)(14). This definition appears to have been adopted by the Commissions. *See* REGULATORY COMMENTARY ON EQUITY LENDING PROCEDURES (Oct. 7, 1998) at APPENDIX 53, http://www.occc.state.tx.us/Pubdocs/HomeEquity/Cmnt_109.pdf (attached hereto as Exhibit 7) (quoting the above definition of "open-end account").

Plaintiffs' modifications did not turn their home equity loan into an open-end account. First, nothing in the Loan Modification Agreements contemplates repeated transactions, nor do the Loan Modification Agreements authorize Plaintiffs to make purchases or borrow money. As discussed above, the capitalization of past-due interest does not even constitute an advance of additional funds. *See supra* § II(C). But even if that were not the case, the Commissions have explicitly stated that "[a]mounts advanced by the lender after closing *as a result of default ... are not contemplated repeated transactions such that they would characterize the loan as an open-end account.*" REGULATORY COMMENTARY (Ex. 7) at APPENDIX 53 (emphasis added).

Second, nothing in the Loan Modification Agreements provides for the charging from time to time of interest or time price differential on an outstanding unpaid balance.[10] Rather, Plaintiffs' modifications provide for a fixed schedule of payments based on a steadily declining principal balance and the interest accruing on that balance each month.

Third, the terms of Plaintiffs' modifications do not allow for the amount of credit to be extended during the term of the loan based on the extent that any outstanding balance is repaid, or under any other circumstances for that matter. As the Commissions have stated, one of the hallmarks of a closed-end account—which is obviously the opposite of an open-end account—is

---

[10] Time price differential is "[t]he difference between a seller's price for immediate cash payment and a different price when payment is made later or in installments." BLACK'S LAW DICTIONARY 1492 (7th ed. 1999).

that "credit is not made available to the extent that outstanding balances have been repaid." REGULATORY COMMENTARY (Ex. 7) at APPENDIX 53. That accurately characterizes Plaintiffs' loan both before and after the modifications. Even if Plaintiffs were to pay down the principal on their loan, neither the original nor the modified terms of the loan would provide them with a contractual right to re-borrow the principal that had been paid or to be extended additional credit to the extent that the principal balance had been repaid. Moreover, Plaintiffs' loan modifications did not extend additional credit to the extent that Plaintiffs had repaid the principal on their loan because (1) there was no advance of additional funds, and (2) even if the capitalization of past-due interest could be construed as an extension of additional credit, the amount capitalized was not determined by the amount of principal they had repaid, but rather by the amount of Plaintiffs' default—i.e., the interest and other charges that should have been repaid, but had not been.

Because Plaintiffs' modifications did not result in an open-end account, as defined by applicable law, their claim under section 50(a)(6)(F) should be dismissed with prejudice.

**G.   LENDERS MAY CAPITALIZE PAST-DUE AMOUNTS RATHER THAN WAIVE THEM OR REQUIRE THE BORROWER TO BECOME CURRENT PRIOR TO MODIFICATION**

In a single paragraph in the Amended Complaint, Plaintiffs assert that, "since there may not be additional principal, borrowers with past-due interest either have to bring their loans current, or the lender or servicer has to waive the interest arrears." Amended Complaint ¶31. According to Plaintiffs, the Commissions "issued an explicit advisory to this effect in April, 2009." *Id.* Although this contention does not appear to form the basis of any specific claim other than those already addressed above, Carrington addresses it here because it is incorrect and demonstrates a fundamental misunderstanding of the advisory at issue.

In April 2009, the Commissions disseminated a Home Equity Modification Advisory Bulletin ("Advisory Bulletin"). Significantly, the Commissions included a disclaimer at the top

of the Advisory Bulletin that is printed in bold type and prominently set apart from the rest of the document by a thick border, as follows:

> **This statement on Article XVI Section 50(a)(6)(L)** *is not meant to negate the applicability or legality of any other method of modifying a home equity loan.* **This statement is** *solely meant to endorse the permissibility of the following method.* **Any modification must also comply with any applicable federal and state laws.** *This statement is not an interpretation of the Texas Constitution* **and is** *not* **being issued under the Texas Finance Code, § 11.308 and § 15.413.**

ADVISORY BULLETIN (Ex. 6) at APPENDIX 46 (italics emphasis added).

As emphasized above, three things of significance clearly stand out in the disclaimer. First, the Advisory Bulletin explains that its sole purpose is to "*endorse the permissibility*" of a method of modification that is discussed therein. *Id.* Second, the Advisory Bulletin explicitly states that it "*is not meant to negate the applicability or legality of any other method of modifying a home equity loan.*" *Id.* Third, the disclaimer clarifies that the Advisory Bulletin "*is not an interpretation of the Texas Constitution*" and was not issued pursuant to the Commissions' constitutional and statutory authority to interpret the home equity provisions of the Texas Constitution. *Id.* In short, the Advisory Bulletin is nothing more than a safe harbor for lenders to modify loans in the manner described therein—i.e., by requiring the borrower to "pay[] the lender whatever is necessary to bring the home equity loan current on or before the date that the home equity loan is modified" or by "waiv[ing] the accrued interest as of the date the home equity loan is modified." *Id.* Nothing in the Advisory Bulletin restricts lenders from using other, equally appropriate, and legal methods of modifying home equity loans. As discussed above, one such method is for the lender to capitalize the existing past-due amounts so that the post-modification installments equal or exceed the amount of accrued interest as of the

date of the first post-modification installment. Plaintiffs' efforts to create a prohibition against capitalizing accrued interest as part of a loan modification should be rejected.

## IV.    CONCLUSION AND PRAYER

Plaintiffs willingly accepted modifications of their home equity loan after they twice defaulted and were about to lose their home to foreclosure. By capitalizing the past-due interest, Carrington enabled Plaintiffs to avoid foreclosure. By lowering the interest rate at the same time, the modifications also substantially lowered Plaintiffs' monthly principal and interest payments. Plaintiffs should not now be rewarded with a financial windfall for their multiple defaults. The Texas Supreme Court has repeatedly stressed the importance of protecting the longstanding principle of providing homeowners the flexibility to rearrange their debt and thereby avoid foreclosure on their homestead. That is exactly what happened here. Carrington should not be punished for trying to help Plaintiffs avoid foreclosure by rearranging their debt with a modification when continuing to make payments was no longer possible.

More importantly, Texas law does not support Plaintiffs' legal theories. Plaintiffs' modifications were not refinances, and no additional funds were advanced as part of the modifications. Thus, it was not necessary for Carrington to re-comply with all of section 50(a)(6) of the Texas Constitution or its related provisions such as sections 50(f) and 50(g). Furthermore, section 50(a)(6)(B) applies only to the principal amount of the extension of credit on the date the extension of credit is made and subsequently capitalized amounts that are the result of the borrower's default are not considered part of the principal amount for purposes of the eighty-percent loan-to-value test in that section. And finally, a modification of a home equity loan that simply capitalizes past-due interest does not convert the loan into an impermissible open-end account under section 50(a)(6)(F). Because Plaintiffs' legal theories are insupportable as a matter of law, all of their claims should be dismissed with prejudice.

---

WHEREFORE, Defendant Carrington Mortgage Services, LLC respectfully asks the Court to dismiss with prejudice Plaintiffs' First Amended Class Action Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Carrington further requests that the Court dismiss such claims with prejudice since, as a matter of law, Plaintiffs cannot state a claim upon which relief can be granted. Finally, Carrington requests that the Court grant it all further relief at law and in equity to which it may be justly entitled.

Respectfully submitted,

Thomas G. Yoxall
  Texas Bar No. 00785304
  tyoxall@lockelord.com
Robert T. Mowrey
  Texas Bar No. 14607500
  rmowrey@lockelord.com
Daron L. Janis
  Texas Bar No. 24060015
  djanis@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
(214) 740-8000
(214) 740-8800 – Facsimile

B. David L. Foster
  Texas Bar No. 24031555
  dfoster@lockelord.com
Amanda M. Schaeffer
  Texas Bar No. 24059115
  aschaeffer@lockelord.com
LOCKE LORD LLP
100 Congress Avenue, Suite 300
Austin, TX  78701-4042
(512) 305-4700
(512) 305-4800 – Facsimile

COUNSEL FOR DEFENDANT CARRINGTON
MORTGAGE SERVICES, LLC

## CERTIFICATE OF SERVICE

I certify that, on March 12, 2012, a true and correct copy of the foregoing was served on the following individuals by the method indicated below:

*By E-mail and CMRRR #7179 1000 1649 1305 3685*
J. Patrick Sutton
Law Office of J. Patrick Sutton
710 W. 14th Street, Suite A
Austin, Texas 78701
Facsimile: (512) 355-4155
E-mail: jpatricksutton@jpatricksuttonlaw.com

*By E-mail and CMRRR #7179 1000 1649 1305 3746*
David M. Gottfried
The Law Office of David M. Gottfried, PC
1505 W. 6th Street
Austin, Texas 78703
Facsimile: (512) 472-4013
E-mail: david@davidgottfriedlaw.com

*By E-mail and CMRRR #7179 1000 1649 1305 3876*
Jeffrey W. Hurt
Hurt & Berry, LLP
10670 N. Central Expressway, Suite 450
Dallas, Texas 75231
Facsimile: (214) 382-5656
E-mail: jwhurt@hurtberry.com

COUNSEL FOR PLAINTIFFS


Daron L. Janis
Counsel for Defendant

---